

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-15-00492-CR

George **MUNOZ**, Jr.,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 226th Judicial District Court, Bexar County, Texas
Trial Court No. 2015CR5575
Honorable Sid L. Harle, Judge Presiding

Opinion by:  Rebeca C. Martinez, Justice

Sitting:  Sandee Bryan Marion, Chief Justice
Rebeca C. Martinez, Justice
Luz Elena D. Chapa, Justice

Delivered and Filed:  January 4, 2017

AFFIRMED

George Munoz, Jr. appeals his conviction for felony murder, asserting there was error in

the jury charge and the evidence was insufficient to prove he committed the underlying felony.

We overrule Munoz's issues and affirm the trial court's judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

On the afternoon of June 16, 2013, at approximately 5:00 p.m., George Munoz was driving

a silver Toyota Corolla in the right-hand lane of westbound Culebra Road in San Antonio.  Munoz

waved down Steven Vargas, the driver of a silver Dodge Charger in the left-hand lane traveling

the same direction as Munoz, and the two men began to argue through the windows of their vehicles. Both vehicles stopped side by side at the traffic light at the intersection of Culebra and 36th Street. Munoz brandished a firearm and aimed it at Vargas's girlfriend, who was sitting in the passenger seat. Vargas exited his vehicle and began walking toward Munoz's vehicle, attracting the attention of Officer Israel Escareno, whose patrol vehicle was stopped on 36th Street at the same intersection, i.e., perpendicular to the street where Munoz and Vargas were stopped. Upon noticing the unfolding confrontation, Officer Escareno activated his overhead lights and made a left turn on to Culebra, stopping his patrol car directly in front of Munoz's vehicle in order to assess and attempt to de-escalate the situation. Before Officer Escareno could exit his patrol car, Munoz drove forward and hit the front bumper of the patrol car. Munoz then reversed his vehicle, drove around the front of the patrol car, and quickly sped away.

A relatively short, but high-speed chase ensued. Officer Escareno called for backup and pursued Munoz's vehicle down westbound Culebra. Officer Escareno testified that the chase reached speeds up to 80-90 miles per hour. Within a short period of time (less than one minute), Munoz failed to keep his vehicle in his lane while navigating a curve and drifted into the oncoming traffic lanes. Munoz's vehicle showed no signs of an attempt to brake before it crashed into an oncoming white Chevy Caprice at a high rate of speed. Seven-year-old Edward Lindsay, who was a passenger in the vehicle, suffered fatal injuries and was pronounced dead at the scene. Immediately after the collision, Officer Escareno approached the damaged vehicles and saw Munoz reaching for a firearm. Officers disarmed Munoz and he was taken into custody. Munoz was indicted for the murder of Edward Lindsay committed during the course of the felony of evading arrest. Munoz pled not guilty and proceeded to a jury trial.

*Trial Evidence*

At trial, Officer Escareno testified about the sequence of events as set forth above. Vargas's girlfriend, Jacquelene Lopez, also testified to her observation of the events. Lopez stated that she was riding in the passenger seat of Vargas's vehicle when she noticed Munoz, the driver of the car to the right, attempting to "flag down" Vargas, the driver. Once she realized that Munoz was attempting to speak with Vargas, she told Vargas and he lowered her passenger-side window to speak with Munoz while continuing to drive. Lopez testified that it seemed as if the two men knew each other and the conversation began in a normal tone. However, it quickly escalated to the point where Munoz pulled out a gun and pointed it at her and Vargas from the window of his vehicle. Lopez explained that once both vehicles came to a stop at the red light at the intersection of Culebra and 36th Street, Vargas exited his vehicle and walked toward Munoz's vehicle. Lopez stated there was a marked police car at the intersection and the officer turned and pulled his patrol car in front of the two vehicles. She stated the overhead lights on the patrol car were turned on at the time. She testified the police car was a marked patrol vehicle and the officer was in uniform. According to Lopez, Munoz drove forward "with force" and "started to hit the [patrol] car to move the police car out of the way." Munoz then reversed his vehicle, went around the police car, and sped off. Lopez testified that Vargas did not have a gun.

In addition, security camera footage from a nearby Dairy Queen restaurant was introduced into evidence and played for the jury. The video confirms the sequence of events testified to by Officer Escareno and Lopez, showing: two vehicles traveling in the same direction and stopping side-by-side at the traffic light; the man in the vehicle closest to the camera getting out and walking toward the other vehicle; Officer Escareno's patrol car, stopped at the same intersection traffic light, its lights activated and turning in front of the other two vehicles; the driver of the farthest vehicle from the camera driving forward and hitting Officer Escareno's patrol car head-on; and

that vehicle then backing up a few feet before swerving around the patrol car and speeding away with Officer Escareno in pursuit.

Detective Tommy Johnson testified to the speed of Munoz's vehicle during the chase and to the lack of any attempt to slow down before hitting the oncoming vehicle. Johnson indicated that the accident scene had no signs of "yaw marks," which are caused when a vehicle abruptly brakes when driving at a high rate of speed. Johnson testified that Munoz's vehicle was driving at full speed when the impact occurred. Officer Escareno testified that speeds reached in excess of 80-90 miles per hour during the pursuit.

Finally, another eyewitness testified that Munoz was driving at a high rate of speed when he struck the vehicle in which Edward Lindsay was a passenger. Melissa Gomez testified she was driving behind Lindsay's vehicle when it was struck. She testified that her vehicle was slowing down due to a yellow light when Munoz's silver car "came out of nowhere" and struck the vehicle in front of hers, with the impact forcing the car from the left lane of eastbound Culebra into a shopping center more than a lane away.

The jury found Munoz guilty of felony murder, with an affirmative finding that the motor vehicle was used as a deadly weapon. *See* TEX. PENAL CODE ANN. § 19.02(b)(3) (West 2011). Munoz pled true to the State's enhancement allegation based on a prior felony conviction, which increased the punishment range to 15 to 99 years, or life, imprisonment. The trial court sentenced Munoz to life imprisonment. Munoz filed a motion for new trial asserting that the verdict was contrary to the evidence. No hearing was held on the motion and it was denied by operation of law. Munoz now appeals.

### JURY CHARGE

In his first three issues on appeal, Munoz asserts: (1) the trial court erred in refusing to submit a jury instruction on criminally negligent homicide as a lesser-included offense of murder;

(2) the trial court erred by limiting the definitions of "intentionally" and "knowingly" to the nature of the conduct, rather than the result of the conduct; and (3) the trial court erred in failing to require the jury to unanimously agree on the specific traffic offense that Munoz committed as the "act clearly dangerous to human life" that resulted in the death of the victim.

We analyze an allegation of jury charge error in two steps, first determining whether error exists and then whether the degree of harm necessary for reversal occurred. *Ngo v. State*, 175 S.W.3d 738, 743-44 (Tex. Crim. App. 2005). If error exists and the error was preserved, reversal is required if "some harm" exists. *Id.* If error exists, but it was unpreserved, then the error must have caused actual "egregious harm" to warrant reversal. *Id.*

### Criminally Negligent Homicide as a Lesser-Included Offense

In his first issue, Munoz asserts the trial court erred in declining to submit a lesser-included offense instruction on criminally negligent homicide. Munoz requested the lesser-included offense instruction during the charge conference, but the trial court denied it; therefore, any error was preserved.

In determining whether error occurred, we engage in a two-step lesser-included-offense analysis. *Hall v. State*, 225 S.W.3d 524, 527 (Tex. Crim. App. 2007). First, we compare the elements and the facts of the offense alleged in the indictment with the elements of the potential lesser-included offense to determine whether the lesser-included offense is included within the proof necessary to establish the charged offense. *Id.* at 531, 535. This question is a matter of law, and is not dependent on the evidence to be produced at trial. *Id.* at 535; *Rice v. State*, 333 S.W.3d 140, 144 (Tex. Crim. App. 2011) (this question of law is reviewed de novo). The second step of the analysis requires us to determine whether there is some evidence in the record that would permit a rational jury to find that, if the defendant is guilty, he is guilty only of the lesser-included offense. *Hall*, 225 S.W.3d at 536. The evidence must establish the lesser-included offense as "a

valid, rational alternative to the charged offense." *Rice*, 333 S.W.3d at 145 (quoting *Hall*, 225 S.W.3d at 536).

Beginning with the first prong of the *Hall* test, an offense is a lesser-included offense if: (1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged; (2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission; (3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or (4) it consists of an attempt to commit the offense charged or an otherwise included offense. TEX. CODE CRIM. PROC. ANN. art. 37.09 (West 2006). Focusing on the elements of the two offenses, a person commits felony murder if he commits or attempts to commit a felony (other than manslaughter), and in the course of and in furtherance of the felony commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(3). Under the statute, a culpable mental state is required for the underlying felony, but there is no culpable mental state for the murder itself. *See Lomax v. State*, 233 S.W.3d 302, 304 (Tex. Crim. App. 2007) (legislature's removal of culpable mental state from only subsection (b)(3) of section 19.02 is a clear indication of its intent to dispense with a mental culpability element in felony murder); *see also Threadgill v. State*, 146 S.W.3d 654, 665 (Tex. Crim. App. 2004) (felony murder is an unintentional murder committed in the course of a felony). Therefore, to prove felony murder as charged in this indictment, the State had to prove that Munoz intentionally evaded arrest/detention with a motor vehicle, but did not have to prove that Munoz intended to kill anyone. *See Lomax*, 233 S.W.3d at 306-07 ("the very nature of the felony-murder rule is that there is no culpable mental state 'for the act of murder'").

A person commits the offense of criminally negligent homicide if he causes the death of an individual by criminal negligence. TEX. PENAL CODE ANN. § 19.05(a) (West 2011). A person acts with "criminal negligence," or is criminally negligent, with respect to circumstances surrounding his conduct, or the result of his conduct, when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. *Id.* § 6.03(d) (West 2011). The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint. *Id.* Thus, criminally negligent homicide requires proof of an element that felony murder does not — a specific mental state, i.e., criminal negligence — with regard to the death of the individual. *See Jones v. State*, 100 S.W.3d 1, 6-7 (Tex. App.—Tyler 2002, pet. ref'd).

Munoz concedes that criminally negligent homicide is not a lesser-included offense of felony murder because the former requires a culpable mental state with regard to the death while the latter does not. *See Lomax*, 233 S.W.3d at 306-07; *see also Esparza v. State*, No. 04-06-00502-CR, 2007 WL 2042731, at *1 (Tex. App.—San Antonio July 18, 2007, no pet.) (mem. op., not designated for publication) (holding the elements of felony murder and criminally negligent homicide do not meet *Hall*'s first prong); *Driver v. State*, 358 S.W.3d 270, 279 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (criminally negligent homicide cannot be a lesser-included offense of felony murder). Munoz contends, however, that *Hall*'s first prong is met here because the wording of the indictment in this case is unique. His argument is based on the State's inclusion of the non-statutory "intentionally or knowingly" language in the first line, which Munoz contends transformed the charged offense from felony murder into intentional murder, for which criminally negligent homicide is a lesser-included offense. *See Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992) (criminally negligent homicide is a lesser-included offense of murder).

The indictment[1] alleged that on or about June 16, 2013, Munoz did

> intentionally or knowingly commit or attempt to commit an act clearly dangerous to human life, to-wit: DRIVING AND OPERATING A MOTOR VEHICLE AT A SPEED THAT WAS NOT REASONABLE AND PRUDENT UNDER THE CIRCUMSTANCES THEN EXISTING AND/OR SPEEDING AND/OR DRIVING AT A HIGH RATE OF SPEED AND/OR FAILING TO CONTROL SPEED AND/OR FAILING TO APPLY THE BRAKES IN A TIMELY AND REASONABLE MANNER AND/OR FAILING TO MAINTAIN A SINGLE LANE OF TRAFFIC AND/OR DRIVING A MOTOR VEHICLE THE WRONG WAY ON A PUBLIC ROADWAY AND/OR DRIVING A MOTOR VEHICLE INTO ONCOMING TRAFFIC AND/OR FAILING TO TAKE PROPER AND NECESSARY EVASIVE ACTION TO AVOID COLLIDING WITH ANOTHER MOTOR VEHICLE, that caused the death of Edward Lindsay, and the defendant was then and there in the course of intentionally committing a felony, to-wit: Evading arrest or detention in a motor vehicle, and said death of Edward Lindsay was caused while the defendant was in the course of and in furtherance of the commission or attempt of said felony.

The application paragraph of the charge tracked the language of the indictment and instructed the jury to find Munoz guilty of murder if they found those elements beyond a reasonable doubt.

Munoz's argument is that the State's superfluous inclusion of the mental state "intentionally or knowingly" immediately preceding "commit or attempt to commit an act clearly dangerous to human life . . . that caused the death" had the effect of charging Munoz with intentional murder under either section 19.02(b)(1) (intentionally or knowingly causing the death) or 19.02(b)(2) (intending to cause serious bodily injury and committing an act clearly dangerous to human life that causes the death), rather than felony murder in which the death is unintended. *Compare* TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (West 2011) (two types of intentional murder), *with id.* § 19.02(b)(3) (unintentional felony murder). In other words, Munoz argues the addition of the non-statutory *mens rea* of "intentionally and knowingly" in the first line of the indictment

---

[1] Munoz successfully quashed the original indictment on the ground that it failed to allege a culpable mental state for the underlying felony offense, evading arrest. The State's subsequent indictment not only included the allegation that Munoz "intentionally" evaded arrest/detention, but also included the language "intentionally or knowingly" in the first line immediately preceding the phrase "commit or attempt to commit an act clearly dangerous to human life."

required the State to prove he intended to cause Lindsay's death — he either intended to kill Lindsay, or he intended to cause Lindsay serious bodily injury and committed a dangerous act that resulted in Lindsay's death. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2).

The State acknowledges the "intentionally or knowingly" language in the first line of the indictment is superfluous in that it was not required by the felony murder statute. *See id.* § 19.02(b)(3). The State asserts, however, that the additional mental state did not alter the character of the murder offense charged because its only effect was to increase the State's burden of proof; the added mental state required the State to prove Munoz committed the dangerous act with a specific mental state, i.e., "intentionally or knowingly," and the State contends its evidence met that burden.[2]

We agree with the State that the additional mental state alleged in the indictment did not transform the charged offense from felony murder to intentional murder, as Munoz contends. In arguing that the added language "intentionally or knowingly" refers to the result of "causing the death," Munoz misreads the indictment as viewed in its full context. Read in context, it is clear that the "intentionally and knowingly" mental state immediately precedes and thus modifies the allegation that Munoz engaged in certain dangerous conduct, i.e., he "committed or attempted to commit an act clearly dangerous to human life" by engaging in one of the several listed traffic offenses; thus, the allegation was that Munoz intended to engage in the dangerous driving conduct, not that he intended to cause the victim's death. The plain text of the indictment shows that the superfluous "intentionally and knowingly" mental state modifies the conduct of committing one of the alleged dangerous acts, not the result of causing the victim's death. The indictment does not charge Munoz with "intentionally and knowingly" causing Lindsay's death as required for

---

[2] Munoz does not complain on appeal that the State failed to prove he "intentionally and knowingly" committed a dangerous act that led to Lindsay's death.

intentional murder; it charges an unintentional murder that occurred as a result of a "clearly dangerous act" committed during the course of a felony. The only effect of the superfluous mental state was to increase the State's burden of proof by requiring it to prove that Munoz not only committed one of the various dangerous acts (traffic offenses), but did so "intentionally and knowingly," e.g., he intentionally drove at a high rate of speed, or he intentionally failed to maintain a single lane of traffic. *See Curry v. State*, 30 S.W.3d 394, 399 (Tex. Crim. App. 2000) (unnecessary allegations in the indictment which are descriptive or explanatory of an essential element of the offense charged must be proven by the State as alleged, even though needlessly stated). The superfluous language in the indictment did not change the nature of the charged offense from felony murder to intentional murder.

Because all the elements of criminally negligent homicide, which include a culpable mental state, are not included within and cannot be deduced from the facts required to prove the elements of felony murder, which carries no culpable mental state, the first prong of the *Hall* test is not met. The trial court therefore did not err in denying Munoz's request for a lesser-included offense instruction on criminally negligent homicide.

### *Mental State Definitions in Jury Charge*

Munoz's second and third issues are that the trial court erred in limiting the charge's definitions of "intentionally and knowingly" to the nature of the conduct; he asserts the definitions should have instead been directed at the result of the conduct, i.e., the murder. The trial court gave the following definitions of "intentionally" and "knowingly" to the jury:

> A person acts intentionally, or with intent, with respect to the nature of his conduct when it is his conscious objective or desire to engage in the conduct.

> A person acts knowingly or with knowledge with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist.

Munoz's argument is based on the same premise as his first issue, i.e., that, due to the superfluous mental state language, the indictment actually charged him with intentional murder, not felony murder. We have rejected that premise. As stated above, under the felony murder statute, there is no culpable mental state for the act of murder, i.e., the "result;" therefore, it would not be proper for the mental state definitions to be focused on the "result" of conduct. *See Lomax*, 233 S.W.3d at 307. The only culpable mental state required to be proved in felony murder is the mental state accompanying the underlying felony. *Id.* However, because the indictment here did add the unnecessary "intentionally and knowingly" mental state with respect to engaging in an "act clearly dangerous to human life" element, the jury charge properly contained those mental state definitions with regard to the "conduct" of engaging in the dangerous act. The mental state definitions were properly limited to the nature of the conduct, not the result of the death, and therefore did not constitute error.

### *Jury Unanimity*

In his fourth issue, Munoz argues the trial court erred by failing to require the jury to unanimously agree on which one of the several traffic offenses Munoz committed as the "act clearly dangerous to human life" that resulted in the victim's death. Munoz asserts the various traffic violations listed in the indictment "are not different means of committing the same offense . . . [but are] different offenses" themselves. Munoz did not object to the charge on this basis, so if such error exists, we would reverse only if egregious harm occurred. *Ngo*, 175 S.W.3d at 743-44.

The application paragraph of the charge tracked the indictment and instructed the jury to find Munoz guilty of felony murder if it found that Munoz "did . . . intentionally or knowingly commit or attempt to commit ***an act clearly dangerous to human life***, to-wit: Driving and operating a motor vehicle at a speed that was not reasonable and prudent under the circumstances

- 11 -

then existing, or speeding or driving at a high rate of speed, or failing to control speed, or failing to apply the brakes in a timely and reasonable manner, or failing to maintain a single lane of traffic or driving a motor vehicle the wrong way on a public roadway, or driving a motor vehicle into oncoming traffic, or failing to take proper and necessary evasive action to avoid colliding with another motor vehicle, ***that caused the death***" of the victim. (emphasis added). The charge listed the several traffic offenses in the disjunctive, as alternative means of committing the "act clearly dangerous to human life." The jury returned a general verdict of "guilty," which Munoz contends deprived him of unanimity because all twelve jurors may not have agreed on which particular traffic offense constituted the dangerous act.

Under due process, jury unanimity is required on the essential elements of the offense, but not on alternative means of committing the offense. *Pizzo v. State*, 235 S.W.3d 711, 714 (Tex. Crim. App. 2007); *see* U.S. CONST. amends V, XIV; TEX. CONST. art. V, § 13. The jurors must agree that the defendant committed the "same, single, specific criminal act," but need not unanimously find that he committed that crime by one particular manner or means. *Ngo*, 175 S.W.3d at 745; *Schad v. Arizona*, 501 U.S. 624, 631-32 (1991) (there is "no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict"). The "manner and means" describes *how* the defendant committed the specific criminal act, i.e., the *actus reus*. *Ngo*, 175 S.W.3d at 745-46; *Schad*, 501 U.S. at 630. The State may plead alternate "manner and means" of committing the same offense. *Landrian v. State*, 268 S.W.3d 532, 535-36 (Tex. Crim. App. 2008); *Martinez v. State*, 225 S.W.3d 550, 554 (Tex. Crim. App. 2007) (State must set out each separate offense in a separate count of the indictment, but may allege different methods of committing the same offense within a single count).

The question of what the jury must be unanimous about is determined by the text of the applicable criminal statute. *Pizzo*, 235 S.W.3d at 714; *Valdez v. State*, 218 S.W.3d 82, 84 (Tex.

Crim. App. 2007). "The rule of thumb for determining what is the *actus reus* of an offense, i.e., the forbidden conduct about which the jury must be unanimous, and what is 'the mere means of satisfying the *actus reus* element of an offense,' is a simple 'eighth grade grammar' test that looks to the statutory verb defining the criminal act." *Moreno v. State*, 413 S.W.3d 119, 125 (Tex. App.—San Antonio 2013, no pet.) (quoting *Stuhler v. State*, 218 S.W.3d 706, 717-19 (Tex. Crim. App. 2007)); *see Pizzo*, 235 S.W.3d at 714-15 (court looks to the statutory language to discern the gravamen of the offense, or the essential elements, on which the jury must be unanimous, focusing on the main subject, verb, and object, as well as the requisite mental state).

An examination of the text of Penal Code section 19.02(b)(3)[3] shows that the essential elements of felony murder are "(1) an underlying felony, (2) an act clearly dangerous to human life, (3) the death of an individual, (4) causation (the dangerous act causes the death), and (5) a connection between the underlying felony and the dangerous act ('in the course of and in furtherance of . . . or in immediate flight from')." *Contreras v. State*, 312 S.W.3d 566, 583-84 (Tex. Crim. App. 2010); TEX. PENAL CODE ANN. § 19.02(b)(3). Based on the statutory language, the gravamen, or *actus reus*, of felony murder is "committing (or attempting to commit) an act clearly dangerous to human life" that causes the victim's death, during the course of a separate felony offense. *See Pizzo*, 235 S.W.3d at 714-15; *Moreno*, 413 S.W.3d at 125.

Here, the indictment against Munoz contained a single count alleging felony murder under section 19.02(b)(3). Within the same count, multiple traffic violations are listed as alternate

---

[3] Section 19.02(b)(3) provides that a person commits the offense of murder if he:

> (3) commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

TEX. PENAL CODE ANN. § 19.02(b)(3).

manner or means of committing the "clearly dangerous act" element. The jury charge tracked the indictment and properly allowed the jurors to find that Munoz committed "an act clearly dangerous to human life" by finding that he committed *any* of the listed traffic offenses. *See*, *e.g.*, *White v. State*, 208 S.W.3d 467, 468-69 (Tex. Crim. App. 2006) (when a felony murder indictment alleges multiple predicate felonies, the specifically named felonies are not separate elements on which the jury must be unanimous; instead, they are alternate "manner or means" that make up the single "underlying felony" element of felony murder); *Jefferson v. State*, 189 S.W.3d 305, 311 (Tex. Crim. App.), *cert. denied*, 549 U.S. 957 (2006) (when a statute specifies several mental states that will satisfy the intent element of a particular crime, jury unanimity is not required on the specific alternate mental state, as long as unanimity exists that the intent element was proven beyond a reasonable doubt). When several different means of engaging in "the dangerous act" are alleged, they do not constitute a separate offense or separate element on which unanimity is required, but merely constitute alternate "manner and means" of committing the "dangerous act" element of felony murder. *See White*, 208 S.W.3d at 468-69. We have previously held that alternate "manner and means" of committing an offense may be presented in a disjunctive jury instruction without violating the unanimity requirement when the charging instrument alleges the different means within a single count, as it does here. *Moreno*, 413 S.W.3d at 126. Further, when alternate theories of committing the same offense are submitted to the jury in the disjunctive, a general verdict is appropriate. *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991).

We conclude the due process requirement of unanimity on the essential elements of the offense was not violated by allowing the jury to choose any of the disjunctively-listed traffic violations as the "act clearly dangerous to human life" that caused the victim's death.

## SUFFICIENCY OF THE EVIDENCE – EVADING ARREST

Finally, Munoz argues the evidence was insufficient to prove he committed or attempted to commit the underlying felony of evading arrest or detention with a motor vehicle. Specifically, Munoz contends the trial evidence equally supported an inference that he was fleeing from Vargas, the driver of the other vehicle, rather than intentionally fleeing from a police officer who was attempting to detain him.

A person commits the felony offense of evading arrest or detention if he "intentionally flees from a person he knows is a peace officer . . . attempting lawfully to arrest or detain him" and uses a vehicle while in flight from the officer. TEX. PENAL CODE ANN. § 38.04(a), (b) (West Supp. 2016). In reviewing the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have concluded that all of the elements of the offense were proved beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). We defer to the jury's assessment of the credibility of the witnesses and the weight given to the evidence, and presume the jury resolved conflicting evidence and inferences in favor of its verdict. *Jackson*, 443 U.S. at 326; *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

To support his argument, Munoz relies heavily on the video from the Dairy Queen at the intersection where the confrontation began. Munoz asserts the video shows that he began to drive away while Vargas was still walking toward his vehicle, and before Officer Escareno activated his emergency lights. Munoz also cites discrepancies between Officer Escareno's testimony and the video, arguing the officer's testimony was not credible.

First, we disagree with Munoz's characterization of the video, as it clearly shows that Officer Escareno turned on the overhead emergency lights on his patrol vehicle while he was still stopped at the intersection and before he turned onto the street where Munoz's and Vargas's

vehicles were stopped side-by-side. The officer activated his emergency lights after the male occupant of the car closest to the video camera (Vargas) exited his vehicle and walked toward the other vehicle (driven by Munoz). The video shows Officer Escareno then made a left turn at the light and pulled his patrol vehicle directly in front of Munoz's vehicle so that the two vehicles were nose-to-nose. It is correct that the video shows Munoz's vehicle was slowly edging forward as Vargas approached it, before the patrol car pulled in front of Munoz. After Officer Escareno's patrol vehicle pulled in front of Munoz's vehicle, Munoz kept moving forward and collided with the front of the patrol car. The video shows Munoz's vehicle immediately backed up for several feet and then veered to the left around the front of the patrol car, before speeding away down Culebra. Officer Escareno immediately turned his patrol car around and began pursuing Munoz's vehicle out of sight of the video camera. The video shows that Vargas returned to his vehicle after the officer drove away in pursuit of Munoz. Thus, the video shows that Officer Escareno's patrol car lights were activated during the entire sequence of events. Furthermore, based on the "head-on" manner in which Munoz's vehicle struck the patrol car, the video shows Munoz, as the driver, would have been directly facing Officer Escareno at the time of the collision. Based on the video, no rational juror could believe that Munoz did not see Officer Escareno or his marked patrol vehicle with the lights flashing *before* he fled down Culebra.

With respect to Officer Escareno's testimony, Munoz argues he was not credible because the video contradicts the officer's testimony that he observed Munoz standing outside of his vehicle and holding a weapon before Munoz returned to his vehicle and drove it into his patrol car. The video does contradict Officer Escareno's testimony on that point, showing that it was Vargas, not Munoz, who exited his own vehicle and walked toward the other vehicle. The video also shows that the man standing outside the vehicle (Vargas) was not brandishing a weapon. However, the rest of Officer Escareno's testimony about the sequence of events and Munoz's actions is

corroborated by the video, as well as the other trial evidence. It is the jury's role as factfinder to weigh the evidence and resolve any inconsistencies. *Mosley v. State*, 983 S.W.2d 249, 254 (Tex. Crim. App. 1998).

In addition to the video evidence and Officer Escareno's testimony, Vargas's girlfriend, Lopez, testified that, when Munoz pointed the gun at Vargas's vehicle, she heard the girl in the car with Munoz started hitting Munoz and telling him that a police officer was right there at the intersection. Lopez could hear because both vehicles' windows were rolled down. Lopez further testified that, after Munoz hit the police car, Munoz drove away fast and "was running from the police officer." This evidence, along with the other evidence showing the head-to-head position of the police car with Munoz's vehicle, tends to support a finding that Munoz knew of the police officer's presence at the scene of his confrontation with Vargas.

With respect to the chase, Officer Escareno, as well as responding Officer Campacos, testified that their short pursuit of Munoz reached speeds clearly in excess of the posted limit, and that Munoz passed several parking lots which he could have used to pull over. Further, Detective Johnson testified that his investigation of the accident scene showed that Munoz's vehicle left no marks indicating that he attempted to slow down prior to the impact with Lindsay's car. An eyewitness at the scene of the crash testified that Munoz collided with the car at full speed, never attempting to slow down. Finally, there was testimony that after the crash Munoz was observed reaching for a gun, and that heroin was found in his car. Munoz was also on probation at the time. This evidence supports a reasonable inference that Munoz intended to evade arrest or detention and intended to flee from the police officers who were chasing his vehicle in their marked patrol units with lights flashing.

Viewing the evidence in the light most favorable to the jury's verdict, we conclude the evidence is sufficient to establish that Munoz intentionally fled from a person he knew was a police officer who was attempting to lawfully arrest or detain him.

## CONCLUSION

Based on the foregoing analysis, we overrule all of Munoz's issues and affirm the trial court's judgment.

Rebeca C. Martinez, Justice

PUBLISH