

# NUMBER 13-18-00053-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**RODOLFO ALVAREZ,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

---

### On appeal from the 377th District Court
### of Victoria County, Texas.

---

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Hinojosa
Memorandum Opinion by Chief Justice Contreras**

Appellant Rodolfo Alvarez appeals his conviction for felony murder, a first-degree

felony. *See* TEX. PENAL CODE ANN. § 19.02(b)(3) (West, Westlaw through 2017 1st C.S.).

By one issue, appellant argues the trial court failed to limit the definitions of culpable

mental states in the jury charge to the conduct elements required by the offense. We affirm.

## I.  BACKGROUND

Appellant was involved in a high-speed vehicle collision that injured Y.C. and killed Y.C.'s nine-year-old daughter P.C.[1] On January 26, 2017, appellant was indicted for one count of felony murder.  The indictment included four paragraphs that alleged four different ways in which appellant had committed the underlying felony offense.  Later, the State amended the indictment and removed the first two paragraphs.  The State proceeded to trial on felony murder based on the allegations that appellant caused the death of P.C. while committing the felony of:  (1) intoxication assault of Y.C.; and/or (2) aggravated assault of Y.C.  *See* TEX. PENAL CODE ANN. §§ 19.02(b)(3), 22.02(a), 49.07(a)(1) (West, Westlaw through 2017 1st C.S.).

Y.C. testified that she was driving late at night to Wal-Mart in Victoria, Texas. P.C., who was wearing a seat belt, was asleep in the backseat of her vehicle, a 2001 Ford Expedition.  As Y.C. neared Wal-Mart, Y.C. noticed a vehicle turning on the road behind her.  She observed a vehicle's headlights approaching at a high rate of speed in her driver's side mirror.  The next thing Y.C. remembered was waking up in the emergency room.  Y.C. suffered a broken arm, eight broken ribs, lacerations to her head, and a collapsed lung.  Y.C. was informed by her husband and hospital staff that P.C. was in a coma and would likely never regain consciousness.  She decided with her husband to remove P.C. from life support.

---

[1] We use initials to refer to the minor decedent and her family to protect their privacy.  *See* TEX. R. APP. P. 9.8 cmt.; *Salazar v. State*, 562 S.W.3d 61, 63 n.1 (Tex. App.—Corpus Christi 2018, no pet.).

Jeorg-Ann Nevins, a friend of Y.C., testified that on the night of the accident she carried a sleeping P.C. to Y.C.'s vehicle. Nevins explained that she placed P.C. in the driver's side back seat and secured her seat belt with the shoulder strap in front of P.C.

Caesar Villarreal, a corporal with the Texas Department of Public Safety, testified that he reviewed data downloaded from the airbag control module of appellant's vehicle. The data showed that appellant's vehicle was travelling at eighty-nine miles per hour at the point of impact, which caused appellant's vehicle to slow down by 21.97 miles per hour on impact. Appellant's vehicle was a Ford F-350 truck weighing 7,000 pounds, and it collided with Y.C.'s vehicle with an energy of 1.8 million foot-pounds. Villarreal explained the data from appellant's vehicle indicated that nothing was mechanically wrong with the truck. The data also indicated appellant did not depress the brakes at any time prior to impact or take any evasive action. Villarreal explained they were unable to retrieve the data from Y.C.'s vehicle and that, in any event, the recording system in a vehicle like Y.C.'s 2001 Expedition would not have collected any data from a rear-end collision.

Athena Baldwin, a physician's assistant who treated appellant on the night of the collision, testified that appellant informed her he drank occasionally and had diabetes. Baldwin examined appellant about two and one-half hours after the collision. She explained appellant smelled of alcohol and seemed intoxicated. Baldwin testified that there was nothing in the medical records to suggest that appellant was suffering from a diabetic episode at any time on the evening of the collision, and that appellant told her that he drank alcohol and drove a vehicle that night. Appellant told Baldwin he had not lost consciousness.

3

Matthew Janzow, M.D., treated Y.C. for her injuries. Dr. Janzow testified about the injuries suffered by Y.C. and stated that Y.C. was at risk of death and permanent disfigurement had her injuries not been treated. Dr. Janzow explained that he ordered morphine for Y.C. shortly after her arrival and that it was therefore expected that lab work performed later at the hospital would show opiates in her system. He explained that Y.C. took an initial drug screen upon her admission that was negative for all the drugs tested. During his opening statement, defense counsel had suggested that the opiates in Y.C.'s system could have contributed to the collision.

The deputy chief medical examiner of the Travis County Medical Examiner's office, Satish Chundru, M.D., also testified. Dr. Chundru explained that P.C. had a dislocated cervical vertebra, bruise of the spinal cord, a laceration to her liver, and a severe head injury that included severe hemorrhage and bruising of the brain. Dr. Chundru explained that "[i]t takes a significant amount of forces to cause bruising on the brain, and [P.C.] had a significant amount of it." Dr. Chundru explained that the injuries sustained by P.C. were typically fatal and could not be attributed to the way P.C. was removed from the vehicle by police or during her transportation to the hospital. During trial and his opening statement, defense counsel had suggested that the act of removing P.C. from the wrecked vehicle could have caused or contributed to her injuries and death.

Javed Qureshi, M.D., a radiologist, testified he read the images of the scans performed on P.C. Dr. Qureshi noted that P.C. had a significant amount of intraventricular hemorrhage within her head. He explained that the removal of P.C. from the crushed vehicle and her transportation of fifteen or more feet to an ambulance could not have caused the brain injuries P.C. suffered.

4

Officer Jonathan Houser of the Victoria Police Department testified he was performing a late-night safety check at a bar down the road with three other officers when the accident occurred. He explained that he and two other officers went to Y.C.'s vehicle and found P.C. breathing but unconscious. Shortly after checking P.C.'s vitals, the officers realized P.C. was no longer breathing and had no pulse. Houser testified that Officer Blair Cerny of the Victoria Police Department cut P.C.'s seatbelt, removed her from the vehicle, and handed her to Houser. Houser then carried P.C. to an ambulance that had arrived, which was fifteen to twenty feet away. Houser explained that no backboard was used because none was available, and he explained how fellow officers Zambrano and Cerny removed P.C. from the vehicle before placing her in Houser's arms. Houser testified this was done very gently and that there were no violent movements to the child's back or neck.

Officer John Maresh of the Victoria Police Department ran to appellant's car. Officer Maresh testified that appellant was still in the truck and was unaware that a collision had occurred. After appellant got out of the truck, Maresh had a brief discussion with appellant during which appellant admitted to drinking alcohol.[2] Officer Maresh moved appellant to a safe area and performed field sobriety tests, which indicated that appellant was intoxicated.[3] Appellant declined Officer Maresh's request for a voluntary

---

[2] A video recording of Maresh's encounter with appellant was entered into evidence and played for the jury.

[3] Maresh performed a horizontal gaze nystagmus test, and appellant demonstrated six out of six possible clues of intoxication. Maresh then had appellant take ten steps heel-to-toe and walk in a straight line while counting out loud the number of steps in one direction, and then turn around and repeat the task while walking back to the starting point. Going away from the starting spot, appellant counted thirteen steps in total but also took some steps that he didn't count. Walking back towards the start spot, appellant took nine steps. The walk-and-turn test has eight possible clues of intoxication and only two are needed for a decision that an individual is intoxicated; Maresh noted in his report that appellant exhibited four of the clues and stated at trial that, after reviewing the video, he noticed six. Finally, Maresh had appellant perform a

blood specimen. Officer Maresh obtained a search warrant to secure a sample of appellant's blood and then transported appellant to a hospital where he observed the drawing of the blood. The trial court admitted a laboratory report prepared by the Texas Department of Public Safety Crime Laboratory which showed that appellant's blood alcohol concentration was 0.101 grams of alcohol per 100 milliliters.[4]

Austin Carter, an E.M.T. with the City of Victoria Fire Department, approached appellant while he was being questioned by Officer Maresh. Carter explained that appellant did not want to go to the hospital, did not appear to have any injuries, and was not exhibiting any symptoms associated with a diabetic episode or with a concussion. Carter stated that appellant had a very strong smell of alcohol and that appellant told him he had three or four beers.

Brandon Allen, an officer with the Victoria Police Department, testified concerning his investigation of the accident, which included a reconstruction of the collision. Officer Allen's testimony was consistent with Villarreal's, and he testified that the speed limit at the site of the collision was fifty miles per hour. As a result of the impact, Y.C.'s vehicle left the roadway before coming to rest in a ditch 441 feet away. Officer Allen stated that even at such a high rate of speed, appellant should have been able to avoid colliding with Y.C.'s vehicle. Officer Allen testified that no other vehicles contributed to the collision between the two cars.

---

standing test, where appellant performs a one-legged stand. Appellant also failed to successfully complete this test. Maresh explained it was his opinion, after performing the field sobriety tests, that appellant was intoxicated.

[4] Under the Texas Penal Code, a person is intoxicated if their blood alcohol concentration is more than .08 grams of alcohol per 100 milliliters of blood. *See* TEX. PENAL CODE ANN. § 49.01(2)(B) (West, Westlaw through 2017 1st C.S.).

6

At trial, appellant questioned the reliability of the lab results and some of the evidence, as well as the thoroughness of the police investigation and reconstruction of the accident. Appellant also questioned whether the manner of P.C.'s removal from the car contributed to cause her neck injuries and whether Y.C. or other vehicles could have been a contributing factor to the crash.

The jury found appellant guilty of felony murder and assessed punishment at life imprisonment in the Texas Department of Criminal Justice Institutional Division and a $10,000 fine. This appeal followed.

## II. DISCUSSION

By his sole issue, appellant argues the trial court failed to limit the definitions of culpable mental states in the jury charge to the conduct elements required by the offense.

### A. Standard of Review

"[I]n each felony case . . . tried in a court of record, the judge shall, before the argument begins, deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case . . . ." TEX. CODE CRIM. PROC. ANN. art. 36.14 (West, Westlaw through 2017 1st C.S.).

Our first duty in analyzing an alleged jury-charge error is to determine whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (en banc). If we find error, then we analyze that error for harm. *Id.* The degree of harm necessary for reversal depends on whether the appellant preserved the error by objection. *Id.* "When the defendant fails to object or states that he has no objection to the charge, we will not reverse for jury-charge error unless the record shows 'egregious harm' to the defendant." *Id.* at 743–44.

7

Egregious harm is a difficult standard to prove and such a determination must be made on a case-by-case basis. *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011); *see, e.g.*, *Hutch v. State*, 922 S.W.2d 166, 172–74 (Tex. 1996) (en banc); *Anaya v. State*, 381 S.W.3d 660, 665–68 (Tex. App.—Amarillo 2012, pet. ref'd); *Chaney v. State*, 314 S.W.3d 561, 568–73 (Tex. App.—Amarillo 2010, pet. ref'd). Egregious harm exists when the error was calculated to injure the rights of the defendant or deprived the defendant of a fair and impartial trial. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (en banc) (op. on reh'g); *see* TEX. CODE CRIM. PROC. ANN. art. 36.19 (West, Westlaw through 2017 1st C.S.). An error results in egregious harm if it affects the very basis of the case, deprives the defendant of a valuable right, vitally affects the defensive theory, or makes a case for conviction clearly and significantly more persuasive. *Taylor*, 332 S.W.3d at 490; *Ngo*, 175 S.W.3d at 750. To determine whether there was egregious harm, we review "the entire jury charge, the state of the evidence, including the contested issues and weight of the probative evidence, the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole." *Warner v. State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008); *Almanza*, 686 S.W.2d at 171.

## B.    Felony Murder

Appellant was charged under the felony murder statute, which provides that an individual commits the offense of felony murder when he or she:

> commits or attempts to commit a felony, other than manslaughter, and in the course of the commission or attempt . . . he commits . . . an act clearly dangerous to human life that causes the death of an individual.

TEX. PENAL CODE ANN. § 19.02(b)(3); *Miles v. State*, 259 S.W.3d 240, 246 (Tex. App.—Texarkana 2008, pet. ref'd). In other words, felony murder is, essentially, "an

8

unintentional murder committed in the course of committing a felony." *Rodriguez v. State*, 454 S.W.3d 503, 507 (Tex. Crim. App. 2014) (op. on reh'g). In *Lomax v. State*, the Texas Court of Criminal Appeals explained that, because the very essence of felony murder is that an individual unintentionally murders when he causes another person's death during the commission of some type of felony, there is no culpable mental state attached to felony murder under penal code subsection 19.02(b)(3). 233 S.W.3d 302, 305 (Tex. Crim. App. 2007); *Lopez v. State*, No. 04-16-00774-CR, __ S.W.3d __, __, 2018 WL 3129467, at *11 (Tex. App.—San Antonio June 27, 2018, pet. ref'd). Thus, the State must prove the elements of the underlying felony, including the culpable mental state for that felony. *Lomax*, 233 S.W.3d at 306–07; *Lopez*, __ S.W.3d at __, 2018 WL 3129467 at *11; *Munoz v. State*, 533 S.W.3d 448, 453 (Tex. App.—San Antonio 2017, pet. ref'd).

## C.     Conduct Elements of Culpable Mental States

An offense's required culpable mental state may apply to one or more of three conduct elements: (1) the nature of the conduct, (2) the result of the conduct, and (3) the circumstances surrounding the conduct. *Rodriguez v. State*, 24 S.W.3d 499, 502 (Tex. App.—Corpus Christi 2000, pet. ref'd); *see* TEX. PENAL CODE ANN. § 6.03 (West, Westlaw through 2017 1st C.S.). An offense may apply a culpable mental state to any number of these conduct elements to form a criminalized behavior. *Rodriguez*, 24 S.W.3d at 502; *McQueen*, 781 S.W.2d at 603. A trial court errs when it fails to limit the definitions of the culpable mental states to the manner in which they related to the conduct elements required in a particular offense. *Rodriguez*, 24 S.W.3d at 502; *Fraser v. State*, 523 S.W.3d 320, 341 (Tex. App.—Amarillo 2017, pet. ref'd) ("Because the applicable mental state of a result-oriented offense relates to the 'result of the conduct' rather than the

'nature of the conduct,' a charge containing the full statutory definition of the applicable mens rea is erroneous."); *see Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994) (en banc).

With a result-oriented offense, the State must prove more than just that the appellant engaged in conduct with the requisite criminal intent; the State must also prove that the appellant caused the result with the requisite criminal intent. *Delgado v. State*, 944 S.W.2d 497, 498 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd); *see Cook*, 884 S.W.2d at 490 ("Engaging in conduct is *not* an element in a 'result of conduct' offense and is not relevant unless the voluntariness of the act is an issue."); *Alvarado*, 704 S.W.2d at 39 (noting that, for a result of conduct offense, "[w]hat matters is that the conduct (whatever it may be) is done with the required culpability to effect the *result* the Legislature has specified"); *Chaney v. State*, 314 S.W.3d 561, 567 (Tex. App.—Amarillo 2010, pet. ref'd) ("The court's charge for a result oriented offense such as murder should not allow a jury to convict a person based solely on a finding that the accused intentionally or knowingly engaged in conduct which happened to cause death").

**D.     Analysis**

Here, the State alleged in its indictment that appellant was guilty of felony murder because he caused the death of P.C. while committing one or more of the following felonies: (1) intoxication assault of Y.C. and/or (2) aggravated assault of Y.C. causing serious bodily injury. *See* Tex. Penal Code Ann. §§ 19.02(b)(3), 22.02, 49.07(a)(1). The jury charge instructed the jury that it could convict appellant of felony murder if it found beyond a reasonable doubt that appellant committed: (1) intoxication assault of Y.C.; and/or (2) aggravated assault of Y.C. with a deadly weapon; and/or (3) aggravated

10

assault of Y.C. causing serious bodily injury. *See id.* §§ 19.02(b)(3), 22.02(a), 49.07(a)(1).

Appellant argues that the definitions of the culpable mental states included in the jury charge (intentionally, knowingly, and recklessly) were not limited to apply to only the result of his conduct, but instead also included that they applied to the nature of his conduct and surrounding circumstances. In the abstract part of the jury charge, the culpable mental states were defined as follows:

> A person acts intentionally, or with intent, with respect to *the nature of his conduct* or a result of his conduct when it is his conscious objective or desire to *engage in the conduct* or cause the result.

> A person acts knowingly, or with knowledge, with respect *to the nature of his conduct or to circumstances surrounding his conduct* when he is aware of the nature of his conduct or *that the circumstances exist.* A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

> A person acts recklessly, or is reckless, with respect to *circumstances surrounding his conduct* or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that *the circumstances exist* or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

(Emphasis added).[5]

Intoxication assault does not require a culpable mental state. *Shelby v. State*, 48 S.W.3d 431, 440 (Tex. Crim. App. 2014); *see* TEX. PENAL CODE ANN. § 49.07(a)(1) (requiring only proof of intoxication); *see also id.* § 49.11 (West, Westlaw through 2017 1st C.S.) (providing that proof of culpable mental state is not required for conviction of

---

[5] These are the full definitions of the culpable mental states as they appear in the Texas Penal Code. *See* TEX. PENAL CODE ANN. § 6.03(a)–(c) (West, Westlaw through 2017 1st C.S.).

offenses under Chapter 49).[6]   This is because "intoxication can be viewed as an imputed form of recklessness."  *Shelby*, 48 S.W.3d at 440; *Stanley v. State*, 470 S.W.3d 664, 670 (Tex. App.—Dallas 2015, no pet.).  Thus, the culpable mental state definitions in the jury charge that appellant complains of do not apply to the alleged underlying felony of intoxication assault.[7]

Aggravated assault as pleaded here, however, is a result-oriented offense. *Stanley*, 470 S.W.3d at 669; *Sneed v. State*, 803 S.W.2d 833, 836 (Tex. App.—Dallas 1991, pet. ref'd); *see Garfias v. State*, 424 S.W.3d 54, 60–61 (Tex. Crim. App. 2014); *see also* TEX. PENAL CODE ANN. §§ 22.01, 22.02 (West, Westlaw through 2017 1st C.S.); *Shelby*, 448 S.W.3d at 438 ("The gravamen of aggravated assault . . . is either causing bodily injury or threatening bodily injury, depending on which theory has been pleaded in the charging instrument").  Yet, the definitions of the culpable mental states were not properly limited to only the result of the conduct and, thus, the jury charge was erroneous. *See Cook*, 884 S.W.2d 490; *Rodriguez*, 24 S.W.3d at 502; *Delgado*, 944 S.W.2d at 498.

At trial, appellant did not object to the definitions submitted in the jury charge. Accordingly, we proceed to review the entire jury charge, the state of the evidence, the arguments of counsel, and any other relevant information revealed by the record of trial

---

[6] "All of the offenses set forth in Chapter 49 [of the Texas Penal Code], *Intoxication and Alcoholic Beverages Offenses*, require a showing that the defendant was intoxicated in public or was intoxicated or consumed or possessed alcohol while operating some type of motor vehicle or equipment implicating public safety."  *Burke v. State*, 28 S.W.3d 545, 549 (Tex. Crim. App. 2000) (citing TEX. PENAL CODE ANN. §§ 49.02 (public intoxication), 49.03 (consumption or possession of alcoholic beverage in motor vehicle), 49.04 (driving while intoxicated), 49.05 (flying while intoxicated), 49.06 (boating while intoxicated), 49.065 (assembling or operating amusement ride while intoxicated), 49.07 (intoxication assault), 49.08 (intoxication manslaughter) (West, Westlaw through 2017 1st C.S.)) (emphasis in original).  "All of the offenses under Chapter 49 are strict liability offenses."  *Id.* (citing TEX. PENAL CODE ANN. § 49.11 (West, Westlaw through 2017 1st C.S.)).

[7] The abstract part of the jury charged provided that "intoxicated" means "either (1) not having the normal use of mental or physical faculties by reason of the introduction of alcohol into the body; or (2) having an alcohol concentration of 0.08 or more."  *See* TEX. PENAL CODE ANN. § 49.01(2).

12

as a whole to determine whether appellant suffered egregious harm. *Ngo*, 175 S.W.3d at 743; *Almanza*, 686 S.W.2d at 171.

### 1. Jury Charge

Here, the application paragraph in the jury charge stated that, in order to convict appellant of felony murder, the jury needed to find beyond a reasonable doubt that appellant:

> as alleged in the indictment, did then and there;
> > 1. commit the felony offense of:
> > > a. Intoxication Assault of [Y.C.]; and/or
> > > b. Aggravated Assault of [Y.C.] with a deadly weapon; and/or
> > > c. Aggravated Assault of [Y.C.] *causing* serious bodily injury.

(Emphasis added). For the underlying felony alleged under (c), the application paragraph correctly pointed the jury's focus to the result caused by appellant's conduct by the use of the word "causing."[8] *See Patrick v. State*, 906 S.W.2d 481, 493 (Tex. Crim. App. 1995) (en banc); *Ash v. State*, 930 S.W.2d 192, 195 (Tex. App.—Dallas 1996, no pet.); *see, e.g.*, *Peterson v. State*, 836 S.W.2d 760, 765–66 (Tex. App.—El Paso 1992, pet. ref'd) (concluding that no harm was shown from inclusion of both conduct-oriented and result-oriented definitions of "knowingly" because application instruction properly required the jury to find that defendant knowingly caused bodily injury). "Where the application paragraph correctly instructs the jury, an error in the abstract instruction is not egregious." *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999) (en banc); *see Plata v. State*, 926 S.W.2d 300, 302–03 (Tex. Crim. App. 1996), *overruled in part on other grounds by Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997) (en banc); *Patrick*, 906 S.W.2d at

---

[8] The jury charge provided that a person commits aggravated assault "if the person commits 'Assault' and the person: (1) causes serious bodily injury to another; or (2) uses or exhibits a deadly weapon during the commission of the 'Assault.'" The jury charge provided that a person commits assault "if the person intentionally, knowingly, or recklessly causes bodily injury to another."

491–93; *see also Peterson*, 836 S.W.2d at 765–66; *but see Chaney v. State*, 314 S.W.3d 561, 568–72 (Tex. App.—Amarillo 2010, pet. ref'd) (finding charge error to be egregious and harmful when the application paragraph correctly limited the jury's consideration to the result of appellant's conduct because the "vast majority [of the evidence that appellant contested] dealt with appellant's culpable mental state"). Thus, there was no egregious harm if the jury based its verdict on (c). *See Medina*, 7 S.W.3d at 640; *Plata*, 926 S.W.2d at 302–03 (noting that the inclusion of a merely superfluous abstraction never produces reversible error in the court's charge because it has no effect on the jury's ability to fairly and accurately implement the commands of the application paragraph).

Regarding the alleged underlying felony of intoxication assault under (a), as previously noted, no culpable mental state is required. Thus, appellant's argument does not apply because he only complains of the definitions of the mental states applicable to aggravated assault (intentionally, knowingly, and recklessly).

The only alleged underlying felony that was submitted in the application paragraph in a manner that did not limit the jury's consideration to the proper conduct element was aggravated assault with a deadly weapon. *See Cook*, 884 S.W.2d 490; *Rodriguez*, 24 S.W.3d at 502; *Delgado*, 944 S.W.2d at 498. Nevertheless, the trial court's instructions regarding intoxication assault and aggravated assault causing bodily injury did limit the jury's consideration to the proper conduct element. There were, therefore, at least two theories of the offense upon which appellant's conviction was not affected by the charge error. *See Medina*, 7 S.W.3d at 640; *Nava v. State*, 379 S.W.3d 396, 419–20 (Tex. App.—Houston [14th Dist.] 2012), *aff'd*, 415 S.W.3d 289 (Tex. Crim. App. 2013); *see also Cantu v. State*, No. 03-01-00231-CR, 2002 WL 1289882, at *9 (Tex. App.—Austin June 13,

14

2002, pet. ref'd) (mem. op., not designated for publication) (concluding that "the record included substantial evidence for the jury to have concluded that appellant intentionally or knowingly, as defined under the result-oriented concept, caused the death of the victim"). As discussed below, there was overwhelming evidence presented that supported a finding that appellant was guilty under either of those theories of the offense.

### 2. State of the Evidence

The second factor we analyze is the evidence admitted at trial, including the contested issues and weight of the probative evidence. *See Vega v. State*, 394 S.W.3d 514, 521 (Tex. Crim. App. 2013). Here, there was testimony from Maresh that appellant failed field sobriety tests and seemed intoxicated, and the video of the field sobriety tests was admitted into evidence. Appellant can be heard saying on the video that he had consumed alcohol before driving that night and probably had too much to drink, and Maresh testified that appellant smelled of alcohol. On the video, a second officer can be heard explaining to appellant that the officers believed appellant was intoxicated or had been drinking and that he operated a motor vehicle, and appellant replied "yes" to both. Appellant did not dispute Maresh's testimony that he failed the field sobriety tests. Appellant can be seen swaying in the video, and it is clear that he was unable to complete the tests administered by Maresh. Baldwin and Carter also testified that appellant smelled strongly of alcohol when they interacted with him on the evening of the crash. Baldwin testified appellant admitted to drinking alcohol and appeared intoxicated. Furthermore, a lab report was admitted into evidence showing that two hours after the collision appellant had a blood alcohol content of 0.101, which is above the legal limit and indicates he was intoxicated at the time of the collision. *See* TEX. PENAL CODE ANN.

15

§ 49.01(2)(B) (West, Westlaw through 2017 1st C.S.). Thus, the probative evidence that appellant was intoxicated was substantial.

There was also substantial evidence that indicated Y.C. suffered serious bodily injury as a result appellant's conduct. *See id.* § 22.02 (West, Westlaw through 2017 1st C.S.). Serious bodily injury means "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* §1.07(a)(46) (West, Westlaw through 2017 1st C.S.). Here, it was undisputed that appellant was the driver of the vehicle that collided with Y.C.'s car, and there was evidence obtained from the black box from appellant's car that indicated he was traveling at a high rate of speed and took no evasive action before crashing into Y.C.'s vehicle. Testimony from the officers responding to the scene and from the officers who reconstructed the accident supported these facts. Both Y.C. and Dr. Janzow testified as to the extent of the severe injuries Y.C. suffered as a result of the crash. Dr. Janzow testified Y.C. was at risk of permanent disfigurement and death and Y.C. testified she had suffered prolonged loss of function in her right arm as a result of the crash. Thus, the probative evidence in support of a conclusion that appellant committed intoxication assault and aggravated assault causing serious bodily injury is overwhelming. Additionally, there was no evidence that would have led the jury to find that appellant had not caused the injuries to Y.C., *cf. Rodriguez*, 24 S.W.3d at 503, and appellant never argued that his acts were involuntary or that he was not acting intentionally, knowingly, or recklessly when he caused serious bodily injury to Y.C. This indicates that appellant did not suffer egregious harm from the error in the abstract part of the jury charge. *See Medina*, 7 S.W.3d at 640; *Herrera v. State*, 526 S.W.3d 800, 807

16

(Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (concluding that evidence of physical trauma to victim's neck belied appellant's assertion of egregious harm from charge error because the evidence left little risk that a reasonable jury could have concluded that appellant was choking victim but was not aware that his conduct was reasonably certain to cause serious bodily injury); *Nava*, 379 S.W.3d at 419–20; *Render v. State*, 316 S.W.3d 846, 853 (Tex. App.—Dallas 2010, pet. ref'd).

### 3. Arguments of Counsel

The State's opening and closing arguments were inconsistent regarding where the focus of the jury should be as to the conduct element of the culpable mental states. Parts of the State's opening argument and closing argument focused on the nature of the conduct appellant engaged in and parts focused on the result of the conduct, and the same can be said of defense counsel's closing argument. However, during the entirety of the trial proceedings, the State emphasized the nature of appellant's conduct as opposed to the result of his conduct. For example, the State asked all of the officers who testified whether appellant's acts of driving intoxicated, failing to yield right-of way, failing to avoid a collision, and speeding were reckless.

However, as previously noted, appellant never disputed that he was acting intentionally, knowingly, or recklessly. Instead, appellant's defensive theories involved questioning the thoroughness of the police investigation, the reliability of the lab results, the credibility of the witnesses, whether Y.C. or other motorists were partially at fault for the collision, and whether the responding officers could have been responsible for or contributed to the injuries suffered by P.C. when they removed her from the vehicle.

### 4. Summary

17

After reviewing the jury charge, the state of the evidence, and the arguments of counsel, we conclude that appellant did not suffer "egregious" harm from the erroneous culpable mental state definitions included in the jury charge. As to two of the three underlying felonies alleged as the means of committing the offense of felony murder, the application paragraph limited the jury's consideration to the conduct elements applicable to the offense, and the evidence presented in favor of these two underlying felonies was overwhelming. *See Medina*, 7 S.W.3d at 640; *Nava*, 379 S.W.3d at 419–20; *see also Cantu*, 2002 WL 1289882, at \*9. In light of the entire jury charge and the state of the evidence, the inaccurate statements made by the State during trial regarding the applicable conduct elements did not cause appellant egregious harm.

We conclude that the erroneous definition of the culpable mental states submitted in the abstract portion of the jury charge did not affect the basis of the case, deprive appellant of a valuable right, or vitally affect a defensive theory. *See Ngo*, 175 S.W.3d at 750.

We overrule appellant's sole issue.

### III. CONCLUSION

We affirm the trial court's judgment.

DORI CONTRERAS
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
25th day of April, 2019.

18