NO. 07-10-0462-CR
NO. 07-10-0463-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

AUGUST 15, 2012

_____

DAVID ABRAN ANAYA, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 47TH DISTRICT COURT OF POTTER COUNTY;

NOS. 59,854-A & 59,877-A; HONORABLE DAN SCHAAP, JUDGE

_____

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

**OPINION**

Following pleas of not guilty, Appellant, David Abran Anaya, was convicted by a jury of murder in cause number 59,854-A and of aggravated assault with a deadly weapon in cause number 59,877-A. Punishment on the murder conviction was assessed at ninety-nine years confinement and a $5,000 fine and on the aggravated assault conviction at forty years confinement. The sentences were ordered to run concurrently. By a single issue, Appellant questions whether he suffered egregious

harm by the failure of the jury charge to limit the culpable mental state for murder to the result of his conduct. Appellant does not raise any issues in his brief challenging his conviction for aggravated assault with a deadly weapon.[1] We affirm both judgments.

## FACTUAL BACKGROUND

In the early morning hours of May 31, 2009, Angelica Alvarez drove her younger brother Eloy, her boyfriend Markous Sifuentez, his younger brother Steven Sifuentez and the victim in this case, Eric Mireles, to an after-hours club.[2] According to Angelica, upon entering the club they encountered Appellant, whom she did not know, and he warned them not to cause trouble. She testified that he name-dropped gang affiliation and asserted the club was his. Leaving her brother, she and her passengers left the club to visit a friend's house. At approximately 3:30 a.m., they returned to pick up Eloy.

According to the evidence, Appellant's half-brother, Anthony Escoto, who had been involved in a fight earlier, fired a gun in the club parking lot and was jumped and severely beaten by a group of club patrons. Eloy testified that gunshots caused the patrons to head to their respective cars and scurry from the parking lot before police arrived. Eloy, Angelica and Markous ran to Angelica's car to leave.[3]

As they attempted to leave, Anthony was leaning against Angelica's car, bleeding from wounds he sustained in the melee. Markous threw him off so they could leave.

---

[1]The State limits its arguments to the murder conviction as Appellant is not challenging his conviction in cause number 59,877-A for aggravated assault with a deadly weapon.

[2]Angelica had graduated from high school the day before and was out celebrating.

[3]Steven and Eric had remained in the car when they returned to the club to pick up Eloy.

2

Angelica was in the driver's seat, Markous was in the front seat, Steven was seated behind Angelica, Eric was sitting in the middle of the back seat and Eloy was seated behind Markous.  After leaving the parking lot they were driving along Amarillo Boulevard.  Angelica and several of the occupants of her car testified similarly that Appellant's car pulled up beside her car and one of its occupants shouted at them about "jumping" his brother.  They then heard gunshots which resulted in Eric being shot and killed.

Appellant testified during the guilt/innocence phase.  According to his version of the events, while he was inside the club, he heard that Anthony was outside fighting and went to intervene.  After that initial fight, Appellant went back inside the club until closing time.[4]  After the club closed, Appellant, his girlfriend and a friend of hers got in his car to leave.  He noticed a crowd gather in the parking lot and saw "flashes of a gun in the air." He observed a group "pounding on somebody with their feet" and exited his car to see if Anthony was involved.  He found Anthony badly beaten and carried him to his car and placed him in the front seat.  He took Anthony's gun and placed it on the console between the seats.  Because he was on parole he wanted to leave before police arrived.  He further testified that when he pulled up alongside Angelica's car,[5] the front passenger was making aggressive gestures and someone in the back seat pointed a gun at him through the rear passenger window.  According to his testimony, he then shot at Angelica's car to defend himself.  During the investigation, a black toy gun was found under the seat of Angelica's car.  Eloy testified the gun was his but claimed he

___

[4]Anthony had been banned from the club and remained outside.

[5]The female passenger in Appellant's car testified that Appellant wanted to know who attacked his brother and passed several cars after leaving the club to reach Angelica's car which was easily identifiable because it had "Class of '09" painted on the rear window.

was unaware it was in the car at the time of the shooting. A Special Crimes Unit investigator testified that prints were not recoverable from the toy gun. He also testified it resembled a semi-automatic and that the blue and orange coloring indicating it was a toy had been scratched or sanded off to make it look more like a real weapon.

Markous testified that after they left the club they drove along Amarillo Boulevard. At one point he noticed car lights approaching and observed a red Camaro driven by Appellant pull up beside Angelica's car. Both cars had the windows rolled down. Appellant accused the occupants of Angelica's car of being the persons who had "jumped" Anthony and threatened that if they jumped his brother, they jump him. He then pointed a gun out the driver's side window and fired at Angelica's car. Eloy testified that Appellant had his left hand on the steering wheel and fired out the driver's window with his right hand. After shots were fired, Eloy realized that Eric had sustained a gunshot wound to his right temple and had fallen onto his lap. Markous instructed Angelica to take off and they drove to a residence belonging to Eric's cousin, where Eric had been living.

They took Eric's body out of the car and placed it on the driveway. They then hid Angelica's car behind the residence to avoid detection in case Appellant had followed them. Markous banged on the front door of the residence until Eric's cousin answered. She observed the body on her driveway and called 911. Officers were dispatched to the residence to investigate at approximately 4:10 a.m.

After the shooting, Appellant, at Anthony's direction, drove around looking for Anthony's girlfriend. When they found her, Anthony got into her car and left with her.

4

Appellant then drove with his girlfriend to a park where they remained until later that morning. After he drove his girlfriend home, he went home to rest. An investigation of the shooting led a member of the Special Crimes Unit to Appellant's home. After being questioned about the incident at the club, Appellant denied being there; however, he voluntarily went to the police department to answer questions and he consented to a search of his car. He was cooperative until he was informed someone had been shot following the incident at the club. He then terminated the interview and requested counsel. The investigator testified there was not enough information to hold Appellant at that time and he was released. Following a positive identification by witnesses, an arrest warrant for Appellant was issued later that afternoon.

Appellant testified he went to his sister's home after leaving the police department and later had her drop him off at a park so he could think. He had a duffle bag packed, which included the gun used in the shooting. He walked to a nearby gas station and asked someone with New Mexico license plates for a ride. He was given a ride to Albuquerque where he exchanged the gun for lodging. He remained there until his arrest on August 4, 2009.

Numerous law enforcement officers testified about the investigation. Special Crimes Unit investigators determined that Angelica's car had two bullet holes in the rear passenger door and the medical examiner testified that Eric died from a gunshot wound to the head from an undetermined range.

After the evidence was presented and both sides rested, the trial court read the charge to the jury. The abstract portion of the charge instructed the jury on the full

5

statutory definitions of the culpable mental states of "intentionally" and "knowingly" as they appear in the Texas Penal Code. When the trial court read the application portion of the charge to the jury, it did not include a culpable mental state.[6] Following closing arguments, the State discovered the omission and brought it to the court's attention. The court announced to the jury that a correction needed to be made to the charge and, when corrected, would be delivered "shortly." The application paragraph was corrected and, outside the jury's presence, the trial court announced for the record:

> counsel have reviewed the corrected version of the Court's charge, and that will be sent back to the jury at this time and . . . no one has any objection to me providing the corrected charge without bringing the jury back out and reading the charge again. Is that correct?

Both sides agreed. Following its deliberations, the jury returned a unanimous verdict of guilty in both cause numbers.

## ANALYSIS

Appellant contends on appeal that he suffered egregious harm from the trial court's inclusion of the full statutory definitions of "intentionally" and "knowingly" in the abstract portion of the jury charge. While the State concedes the trial court erred by not limiting the statutory definition of "intentionally" and "knowingly" to a "result of conduct" only offense, they contend such error was not egregious. Based upon our analysis of the jury instructions, the evidence, the arguments of counsel, and other relevant

---

[6]As read to the jury, the application paragraph of the court's charge read, in pertinent part, as follows:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 31st day of May, 2009, in Potter County, Texas, the Defendant, David Abran Anaya, did then and there cause the death of an individual, namely Eric Mireles, by shooting him with a firearm, then you will find the Defendant guilty.

information revealed by the record of the trial as a whole, we agree with the State that the error did not cause egregious harm.

## I. MURDER - A "RESULT ORIENTED" OFFENSE

Murder, whether intentionally or knowingly committed, is a result oriented offense. *Cook v. State*, 884 S.W.2d 485, 490 (Tex.Crim.App. 1994). Because the applicable mental state relates to the result of the conduct only, i.e., *causing* of the death, *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex.Crim.App. 2003), a charge which contains the full statutory definition is erroneous. *See Cook*, 884 S.W.2d at 491. *See also Alvarado v. State*, 704 S.W.2d 36, 40 (Tex.Crim.App. 1985). Here, the abstract portion of the court's charge contained the full statutory definitions of intentionally and knowingly as they appear in section 6.03(a) and (b) of the Texas Penal Code.[7] As such, the trial court erred in the submission of its charge to the jury. *Cook*, 884 S.W.2d at 491. The trial court's error was not, however, brought to the attention of the court by a proper objection. *See* Tex. R. App. P. 33.1(a). This failure to preserve jury charge error is not, however, an absolute bar to appellate review. *Warner v. State*, 245 S.W.3d 458, 461 (Tex.Crim.App. 2008). Rather, failure to preserve error establishes the degree of harm necessary for reversal. *Id.*

---

[7]Section 6.03 of the Penal Code defines the culpable mental states of "intentionally" and "knowingly" as follows:

> (a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

> (b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

## II. STANDARD OF REVIEW - UNOBJECTED TO CHARGE ERROR

Unobjected to charge error is reversible if it is so egregious and creates such harm that it deprives the accused of a "fair and impartial trial." *Almanza v. State*, 686 S.W.2d 157, 172 (Tex.Crim.App. 1984) (op. on reh'g). Errors that result in egregious harm are those that affect "'the very basis of the case,' 'deprive the defendant of a valuable right,' or 'vitally affect a defensive theory.'" *See Hutch v. State*, 922 S.W.2d 166, 171 (Tex.Crim.App. 1996) (quoting *Almanza*, 686 S.W.2d at 172). *See also Sanchez v. State*, 209 S.W.3d 117, 121 (Tex.Crim.App. 2006).

When reviewing harm resulting from charge error, an appellate court must determine harm in light of (1) the jury instructions, (2) the state of the evidence, including contested issues and the weight of probative evidence, (3) the arguments of counsel, and (4) any other relevant information revealed by the record of the trial as a whole. *See Almanza v. State*, 686 S.W.2d at 174. *See also Ngo v. State,* 175 S.W.3d 738, 743 (Tex.Crim.App. 2005). Additionally, there is no burden of proof or persuasion in a harm analysis conducted under *Almanza*. *Warner*, 245 S.W.3d at 464.

## III. HARM ANALYSIS

### A. JURY INSTRUCTIONS

In cases where the abstract portion of the court's charge erroneously defines the culpable mental states of intentionally and knowingly, but the application paragraph correctly instructs the jury, the error in the abstract portion usually does not result in

egregious harm.[8]  *Medina v. State*, 7 S.W.3d 633, 640 (Tex.Crim.App. 1999) (citing *Plata v. State*, 926 S.W.2d 300, 302-03 (Tex.Crim.App. 1996)); *Gonzales v. State*, No. 07-10-0245-CR, 2011 Tex. App. LEXIS 5474, at *6-9 (Tex.App.--Amarillo, July 18, 2011, pet. ref'd).  *But see Chaney v. State*, 314 S.W.3d 561, 568-72 (Tex.App.--Amarillo 2010, pet. ref'd) (finding charge error to be egregious).  The critical distinction arises when the circumstances surrounding the trial of the case allow or cause the trier of fact to fail to "understand the meaning of concepts and terms used in the application paragraphs of the charge" and thereby fail to fully appreciate the subtle difference between an intentional *result* and intentional *conduct.  See Plata,* 926 S.W.2d at 302, *overruled on other grounds by Malik v. State,* 953 S.W.2d 234 (Tex.Crim.App. 1997). For murders involving conduct that "knowingly causes the death of an individual," the distinction between a "result of conduct" offense and a "nature of conduct" offense becomes even more blurred because awareness of the result of the conduct necessarily entails awareness of the nature of the conduct as well.  *Medina*, 7 S.W.3d at 640.

Here, the abstract definitions of intentionally and knowingly contained in the court's charge erroneously included references to the nature of Appellant's conduct. The amended application paragraph (albeit never read to the jury), correctly instructed the jury on the culpable mental states as related to the result of Appellant's conduct, i.e., *causing* Eric's death.  Relying on this Court's opinion in *Chaney*, in which we applied all four factors of *Almanza* in conducting a harm analysis, Appellant argues the State failed to prove that it was his purpose that the victim would die as a result of their

---

[8]If a murder indictment traces the statutory definition found in § 19.01(b)(1) ("[a] person commits [murder] if he intentionally or knowingly *causes* the death of an individual"), and the application paragraph of the court's charge then traces the indictment, the court's charge will necessarily charge the correct culpable mental state.

9

confrontation.  While the State counters that the facts in *Chaney* are in "stark contrast" to the facts in the underlying case, the error found in the jury instructions is quite similar.

The Court of Criminal Appeals, however, has held that when the application paragraph correctly instructs the jury, an error in the abstract instructions can be nonegregious.  *See Patrick v. State*, 906 S.W.2d 481, 491-93 (Tex.Crim.App. 1995).  In *Patrick,* the Court reasoned that the jury understood that the "result of conduct" language in the definition was to be applied to the "cause the death" language in the application paragraph.  *Id.*  Thus, in this case, because the plain language of the jury instructions contained in the application paragraph correctly instructed the jury on the law, the first *Almanza* factor can be seen as favoring a finding the error was not egregious.

### B. THE STATE OF THE EVIDENCE

Here, there is no real dispute that the shots fired by Appellant that fateful night ultimately resulted in the death of Eric Mireles.  The question is not, however, whether the conduct of Appellant was intentional or knowing; the question is whether the result of that conduct, i.e., Eric's death, was intentional or knowing.  Appellant maintains that it was not.  He contends that, at the time the shots were fired, he was merely defending himself and that he fired his weapon in self-defense.  Appellant's self-defense theory is not, however, inconsistent with a finding that he either intended someone in Angelica's car to die or that he was reasonably certain that someone would die as a result of those shots being fired.  Furthermore, because a culpable mental state may be established through circumstantial evidence, *Dillon v. State*, 574 S.W.2d 92, 94 (Tex.Crim.App.

10

1978), an intent to *cause* the death of another can be circumstantially inferred from the use of a deadly weapon in a deadly manner. *Medina*, 7 S.W.3d at 637; *Adanandus v. State,* 866 S.W.2d 210, 215 (Tex.Crim.App. 1993). Here, Appellant fired a deadly weapon into a crowded car at close range. Because the circumstantial evidence does support the jury's implicit finding that Appellant intended to cause someone's death, the second *Almanza* factor also favors a finding that the error was not egregious.

## C. THE ARGUMENTS OF COUNSEL

From a review of the record it is not readily apparent that counsel fully appreciated the distinction between a result oriented offense and a conduct oriented offense. Throughout *voir dire* the State's counsel makes reference to an actor's conduct and then asks whether intent to engage in that conduct can be inferred from the conduct itself. While the suggested inference may be true, it improperly focuses the element of intent on the conduct, not the result. At one point counsel states, "the State has to prove that this person *acted* knowingly or intentionally." Counsel's misstatement of the law continues during closing arguments when she says, "[w]hat this case comes down to is whether or not the Defendant was *acting* in self-defense or whether he was intentionally and knowingly *shooting* at Eric Mireles . . . ." Nowhere does counsel simply state that it was the State's burden to prove that the defendant intended the result of his actions. Therefore, an overall review of the statements and arguments of the State's counsel leads this Court to conclude that, if anything, they contributed to a misunderstanding of the State's burden of proof. Accordingly, the third *Almanza* factor favors a finding that the error was egregious.

11

**D.    Any Other Relevant Information**

Notwithstanding the esoteric debate concerning the intricacies of application of the definitions of the culpable mental states of intentionally or knowingly to a result oriented offense such as murder, it does not escape this Court's consideration of egregiousness that the State had other theories, perhaps less burdensome, upon which it could have legitimately based a charge of murder.  Specifically, in this case, the State simultaneously charged Appellant with the felony offense of aggravated assault. Section 19.02(b)(3) of the Texas Penal Code provides that a person commits the offense of murder "if he . . . commits or attempts to commit a felony, . . . and in the course of and in furtherance of the commission or attempt, . . . he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." It is not a stretch of the imagination to conclude that firing a deadly weapon into a car, full of people, at close range, is an act clearly dangerous to human life.  Accordingly, we conclude that this factor also weighs in favor of finding that the error was not egregious.

Balancing all four *Almanza* factors, we conclude Appellant was not egregiously harmed by the trial court's error in including the full statutory definitions of intentional and knowing in the abstract portion of the charge.  Appellant's sole issue is overruled.

## Conclusion

Accordingly, the trial court's judgment for murder in cause number 59,854-A is affirmed. The trial court's unchallenged judgment for aggravated assault with a deadly weapon in cause number 59,877-A is also affirmed.


Patrick A. Pirtle
Justice


Publish.