**Affirmed as Modified and Opinion Filed April 23, 2024**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-22-01158-CR

### BLAKE RYAN RICHARDS, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 416th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 416-80133-2022**

## MEMORANDUM OPINION

Before Justices Nowell, Miskel, and Kennedy
Opinion by Justice Nowell

A jury convicted appellant Blake Ryan Richards of capital murder, and the trial court sentenced him to life in prison. In four issues, appellant argues the trial court erred in (1) failing to apply the self-defense instruction to the capital murder application paragraph, (2) admitting improper hearsay, (3) admitting statements that violated code of criminal procedure article 38.22, and (4) incorrectly defining intent in the court's charge. As modified, we affirm the trial court's judgment.

## Background

In early October 2021, appellant's mother died of Covid. Her death set off a deadly chain of events involving her two children, appellant and Brittany Richards (appellant's sister). The siblings always had a contentious relationship; however, their mother's death intensified the feelings. Among other things, the siblings fought over who was the intended beneficiary of their mother's life insurance policy. Robert Richards, their father, encouraged appellant and Brittany to be fair and split the assets regardless of who was determined to be the beneficiary.

On the evening of October 27, 2021, after arguing via text-messaging about the proceeds of the life insurance policy, the siblings had a phone conversation with Robert wherein he urged them to go to dinner and sort out the money situation. He requested they call him later with their resolution.

According to appellant, Brittany began the discussion by accusing him of killing their mother by giving her COVID and yelling that he was incapable of love. Frustrated by Brittany's attitude, appellant told Ross Escalante, Brittany's boyfriend who was also present, that Brittany cheated on him with another man. Ross, who had stood silently by during the siblings' fighting, began arguing with Brittany in the dining room. Appellant entered the kitchen to escape Ross and Brittney's heated argument, but Ross asked appellant to come back into the dining room to talk. Before Ross could speak, however, Brittany grabbed appellant's Glock from where

it was sitting on the dining room table and shot Ross once in his hip. He fell chest first onto a dining room chair, and Brittany shot him five or six more times.

Appellant stood frozen as Brittany continued "shoot[ing] around" a few more times. He slowly approached her and took the gun. Brittany started "talking and rambling" and sat down in a dining room chair facing appellant, who stood six to nine feet away at the end of the dining room table holding the Glock and staring at her. Brittany suddenly "popp[ed] up," and appellant shot her once; he closed his eyes and continued shooting the five or six rounds left in the pistol.

Appellant then retrieved his AR-style rifle from another room. Brittany was still moving a little and making sounds when "I come [sic] back to the front dining area and I sen[t] two or three rounds towards my sister" with the AR-style rifle. He tapped Ross on the head with his shoe to "check" on him and then ran out the front door. Appellant jumped in his car and drove to a Target in Wylie to say goodbye to his girlfriend because he decided committing suicide was better than living with the guilt of killing Brittany.

On the way to Target, appellant called Chris Beherns, his long-time best friend, but Chris did not immediately answer. He texted appellant back, but when appellant did not respond quickly, Chris felt "something was weird." Appellant eventually answered, sounding distressed. Appellant repeatedly apologized and said he loved Chris. Chris told him not to do anything stupid, and appellant said, "I already did." Chris later testified, "[t]he thing that has stuck with me for almost a

year, verbatim he said that he made sure that Brittany was dead and that he shot Ross, and he didn't know if he was alive or not and that he fled."

Appellant and Chris continued exchanging text messages. Appellant told Chris he was either going to turn himself in or kill himself. Chris encouraged appellant to turn himself in, but appellant said, "I'm crazy, dude. I've lost my mind." Chris called 911 to report the double murder and provided contact information for appellant.

Officer Maurice Johnson worked for the Richardson Police Department and was on call the night of October 27, 2021 when he heard the dispatch call regarding Chris's 911 call and the request for a well-check on appellant. Officer Johnson obtained appellant's phone number and called him. Appellant said he hurt his sister and did not want to hurt anyone else. Officer Johnson learned appellant had an AR-style rifle in his car. Officer Johnson told him to leave the rifle in his car, get out, and wait for officers.

Officer Cory Wendling was driving to work when he heard information over his radio regarding Chris's 911 call and appellant's location at Target. Officer Wendling was nearby and drove to the Target. A man approached him and asked if he was looking for Blake Richards. Officer Wendling said yes and the man said, "Well, that's me." Officer Wendling took appellant's cell phone and handcuffed him. Officer Wendling told appellant he was not under arrest but also told appellant

that he knew appellant may have been involved in an incident. Appellant responded, "Yeah, I just lost it."

In the meantime, officers had arrived at appellant's Plano home. Officer Kevin Collins noticed the front door was halfway open, and he saw shell casings inside the front entryway. He observed Ross lying face down on the floor, Brittany lying on her back, and a pistol on the dining room table.

Emily Grimshaw, a criminalist, spent eight hours processing the crime scene. She found four rifle cartridges and twelve handgun cartridges downstairs. She collected two bullets in the dining room, one of which was located under Ross's body. She also found the Glock and observed variant red blood stains in the area.

Grimshaw later photographed appellant and collected gun residue using a gun residue kit. She did not observe any blood or injuries on his body or clothing. She also processed his car and retrieved a rifle from the front right floorboard area.

Dr. Stephanie Burton, a Collin County medical examiner, performed both autopsies. Brittany suffered nine gunshot wounds located mostly on the front of her body causing wounds to her stomach, head, neck, chin, and left breast. Dr. Burton recovered bullets from the small intestine, the musculature of her left back, and her left lung. Brittany's internal exam revealed injuries to multiple organs. Although Brittany suffered many lethal gunshot wounds, Dr. Burton could not identify one specific wound that caused immediate death upon impact. She concluded Brittany's cause of death was multiple gunshot wounds and the manner was homicide.

Ross's autopsy revealed he suffered eleven gunshot wounds, seven of which were through his back. Dr. Burton recovered numerous handgun projectiles from his body, including one from his liver and his heart, likely causing immediate incapacitation. One wound pattern indicated his arm was positioned against his back at the time a projectile hit him. She concluded Ross's cause of death was also from multiple gunshot wounds, and the manner was homicide.

DNA testing confirmed appellant's DNA was on the rifle and excluded Brittany and Ross. Brittany could not be included or excluded from the Glock handle.

The State indicted appellant for intentionally and knowingly causing the deaths of Brittany and Ross by shooting them with a firearm, a deadly weapon, during the same criminal transaction. At trial, the jury was instructed on capital murder and the lesser-included offense of murder. By finding appellant guilty of capital murder, the jury rejected appellant's story that Brittany killed Ross, and appellant killed Brittany in self-defense. The trial court sentenced appellant to mandatory life in prison, and this appeal followed.

## Jury Charge Challenges

In his first issue, appellant argues the trial court erred by failing to include the self-defense instruction to the capital murder application paragraph. The State responds appellant was not entitled to self-defense and, alternatively, was not egregiously harmed because the evidence did not raise deadly-force self-defense.

–6–

In his fourth issue, appellant contends the trial court erred by incorrectly defining intent in the charge. The State agrees it was error, but maintains appellant was not egregiously harmed. We address each issue in turn.

## A. *Standard of Review and Applicable Law*

"[T]he jury is the exclusive judge of the facts," but the trial court submits a charge to the jury "distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. ANN. arts. 36.13, 36.14; *Alcoser v. State*, 663 S.W.3d 160, 164–65 (Tex. Crim. App. 2022). Abstract paragraphs "serve as a glossary to help the jury understand the meaning of concepts and terms used in the application paragraphs of the charge," and application paragraphs apply the "pertinent penal law, abstract definitions, and general legal principles to the particular facts and the indictment allegations." *Alcoser*, 663 S.W.3d at 165 (quoting *Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012)).

Reversible error in giving an abstract instruction occurs only when the instruction is an incorrect or misleading statement of a law that "the jury must understand in order to implement the commands of the application paragraph," and the "failure to give an abstract instruction is reversible only when such an instruction is necessary to a correct or complete understanding of concepts or terms in the application part of the charge." *Id.*

Potential error in a jury charge involves a two-step analysis: First, we determine whether the charge is erroneous. *Id.* If it is, then we must decide whether

–7–

the appellant was harmed by the erroneous charge. *Id.*; *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005) (en banc). If a defendant timely objects to alleged jury-charge error, the record need only show "some harm" to obtain relief. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). If there was not a timely objection, the record must show "egregious harm." *Id.*

Harm is assessed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole. *Id.* An erroneous jury charge is egregiously harmful if it affects the very basis of the case, deprives the accused of a valuable right, or vitally affects a defensive theory. *Id.* A finding of egregious harm must be based on "actual harm rather than theoretical harm." *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011). Egregious harm is a difficult standard to meet, and the analysis is a fact-specific one. *Alcoser*, 663 S.W.3d at 165.

### B. Application Paragraph

The jury charge included a self-defense instruction to the lesser-included offense of murder but did not include the self-defense instruction to the capital murder charge. Specifically, the murder application paragraph stated: "If you found the defendant guilty of the lesser-included offense of murder, you will next consider whether he committed the offense in self-defense."

When a trial court sua sponte instructs a jury on self-defense, as it did here, it assumes a duty to deliver a correct instruction. *Mendez v. State*, 545 S.W.3d 548, 553 (Tex. Crim. App. 2018). Because appellant did not object to the unrequested instruction, any error is subject to an egregious harm analysis. *Id.* at 552–53.

Appellant alleges he raised self-defense by testifying Brittany killed Ross, and he shot Brittany because he was fearful when she "popped up." Appellant argues the trial court "signaled" self-defense was "law applicable to the case" by including a self-defense instruction for murder. Because the trial court assumes a duty to deliver a correct self-defense charge, appellant maintains the trial court should have included the instruction in the application portion to the greater offense of capital murder. *See id.* at 553.

The jury was instructed, "Our law provides that a person commits the offense of Capital Murder if he murders more than one person during the same criminal transaction." However, if the actor intentionally or knowingly caused the deaths of two individuals during the same criminal transaction, but one of the killings was justified under the law, then the person committed only one murder. *Moore v. State*, 969 S.W.2d 4, 12 (Tex. Crim. App. 1998) (en banc). Therefore, the murder could not be capital murder because the actor did not "murder more than one person." *Id.*

The State concedes that *if* appellant was entitled to a self-defense instruction for the lesser-included offense of murdering Brittany, he was also entitled to a self-defense instruction for the capital murder of Brittany and Ross. However, the State

argues appellant was not entitled to *any* self-defense instruction because the evidence did not raise deadly-force self-defense. Because appellant was not entitled to any self-defense instruction, the State maintains appellant cannot establish egregious harm for the trial court's error.

A person is justified in using deadly force when a person reasonably believes the force is immediately necessary to protect the person against another's use or attempted use of unlawful deadly force or to prevent the other's imminent commission of certain offenses, including murder. TEX. PEN. CODE ANN. § 9.32(a). Deadly force is force "intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3). A reasonable belief is one that an ordinary and prudent person would hold in the same circumstances as the actor. *Id.* § 1.07(a)(42). The actor's belief that deadly force was immediately necessary is presumed to be reasonable if the actor (1) knew or had reason to believe that the person against whom the force was used was committing or attempting to commit certain offenses, such as murder; (2) did not provoke the person against whom the force was used; and (3) was not otherwise engaged in criminal activity. *See id.* § 9.32(b)(1)(C), (b)(2)–(3). The use of force against another is not justified in response to verbal provocation alone. *See id.* § 9.31(b)(1); *see also Cooper v. State*, No. 05-22-01085-CR, 2024 WL 396603, at *3 (Tex. App.—Dallas Feb. 2, 2024, no pet.) (mem. op., not designated for publication).

Appellant explained that after he witnessed Brittany shoot Ross, he took the gun from her and walked to the opposite end of the table, which was approximately six to nine feet long. Appellant did not know what she was going to do, but she stopped and looked at him and then "popp[ed] up." He was scared and shot her once. He closed his eyes and then kept shooting. When asked what he feared, he explained:

> Just - - I didn't know what to do. I didn't know if I - - do I run to the back door and try to go through the kitchen and go out the back door? I don't want to turn my back to her. Like, I just - - I don't know. . . . When I try to think back to it now, I don't know if she's going to charge me. I don't know if she's going to go for the front door. I don't know if she was going to go upstairs.

Counsel asked if appellant thought she might try to hurt someone. He answered, "I can't really say. I just know that I was scared." He thought he shot her five or six times with the Glock and admitted she was still moving a little and making sounds so he retrieved his AR-style rifle and shot her two or three more times before leaving the house.

Even if the jury believed Brittany killed Ross, appellant was not justified in using deadly force against Brittany. He did not have a reasonable belief that deadly force was immediately necessary to protect himself when Brittany "popped up" because she was unarmed and standing six to nine feet away from him. When given the opportunity to explain his fear, he could not articulate any reason justifying the use of deadly use. Even if he was justified in the first shots, which he was not, nothing justified him leaving the room, retrieving the rifle and firing more bullets

–11–

into her body "to make sure she was dead" (as he told Chris). Appellant also confessed to Chris that he killed Brittany and Ross; he did not tell Chris he killed either in self-defense. Thus, appellant was not entitled to the sua sponte self-defense instruction, and the trial court erred by including one for the lesser-included offense of murder.

Despite the error, it did not cause appellant egregious harm. An erroneous self-defense instruction does not deprive a defendant of a fair and impartial trial if the evidence does not legitimately raise the issue of self-defense. *See Lozano v. State*, 636 S.W.3d 25, 34–35 (Tex. Crim. App. 2021) (trial court's inclusion of self-defense instruction in charge when evidence does not raise self-defense gives defendant windfall of possible acquittal on that improper basis and elevates State's burden by requiring it to disprove defense to which defendant is not entitled and therefore cannot egregiously harm defendant).

By finding appellant guilty of capital murder, the jury necessarily rejected his testimony that Brittany killed Ross, and instead, the jury believed appellant killed both. In reaching this conclusion, the jury rejected any claim of self-defense. Thus, regardless of the trial court's error in including a self-defense instruction in the lesser-included offense of murder, appellant was not egregiously harmed because he was neither entitled to the instruction nor did the jury reach the question of the lesser-included offense of murder. Appellant's first issue is overruled.

## C. Intent Definition

In his fourth issue, appellant argues the incorrect definition of intent prevented him from receiving a fair trial because it allowed the jury to decide that merely shooting the gun that killed Brittany was enough for a murder conviction without the specific intent to cause her death. The State concedes the charge incorrectly defined the culpable mental state for capital murder because it defined it as a conduct-oriented crime rather than a result-oriented crime; however, it contends appellant was not egregiously harmed. *See Anaya v. State*, 381 S.W.3d 660, 664 (Tex. App.—Amarillo 2012, pet. ref'd) (noting murder is a result-oriented offense and because the applicable mental state relates to the result of the conduct only, i.e., causing the death, a charge containing the full statutory definition of intentionally or knowingly is erroneous).

In conducting an egregious harm analysis, we assess the error in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole. *Almanza*, 686 S.W.2d at 171.

The application paragraph of the jury charge repeatedly and consistently instructed the jury that it must believe beyond a reasonable doubt that appellant "intentionally or knowingly caused the death" of Brittany and Ross before finding appellant guilty. Where the application paragraph correctly instructs the jury, an

error in the abstract instruction is not egregious. *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999) (en banc); *see Smith v. State*, No. 05-22-00491-CR, 2023 WL 7125164, at *6 (Tex. App.—Dallas Oct. 30, 2023, no pet.) (mem. op., not designated for publication) (entirety of charge weighed against egregious harm because application paragraph correctly applied the law and mental states required to support murder conviction).

The state of the evidence weighs against a finding of egregious harm. Appellant shot Brittany nine times, with three of the shots coming from the AR-style rifle he admittedly retrieved after shooting her multiple times with his Glock. Brittany's body contained multiple "shore" wounds, which occur when the skin is up against a hard surface while the bullet is trying to exit. These wounds indicated Brittany was on her back when appellant shot her. Similarly, Ross's body contained eleven gunshot wounds (two of which were reentry wounds) and one pattern indicated his arm was on his back trying to protect himself as appellant repeatedly shot him. Thus, the number of bullet wounds and "shored" wounds indicate appellant intended to cause death and not merely engage in the conduct that led to it. *See, e.g.*, *Mills v. State*, No. 05-22-00146-CR, 2023 WL 2596072, at *3 (Tex. App.—Dallas Mar. 22, 2023, pet. ref'd) (mem. op., not designated for publication); *see also Martin v. State*, 246 S.W.3d 246, 263 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ("Intent can be inferred from the extent of the injuries to the victim, the method used to produce the injuries, and the relative size and strength of the

parties. (citation omitted) In a murder case, evidence of a particularly brutal or ferocious mechanism of death, inflicted upon a helpless victim, can be controlling upon the issue of intent or knowledge.").

In addition to the physical evidence, appellant told his girlfriend he murdered two people. He also told Chris he "made sure Brittany was dead." He admitted he retrieved the rifle and continued shooting into her body as "she was not dead at the time." He told his father he killed Brittany. Thus, the state of the evidence weighs against a finding of egregious harm.

The State emphasized during closing argument that appellant caused the deaths by focusing on the number of gunshot wounds, the injuries to the bodies, and his confessions to his girlfriend and Chris. The State did not indicate appellant merely engaged in conduct that resulted in death. Accordingly, this factor weighs against a finding of egregious harm.

Finally, attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). Appellant admitted to changing his narrative of the events on the night of the murder. He testified, "I've given many different stories, but I know to keep the story the same for up to the point to where I start shooting my sister." He also admitted some stories were to throw prosecutors "in a loop." These inconsistent statements are relevant and weigh against a finding of egregious harm. *See Almanza*, 686

–15–

S.W.2d at 171 (considering any other relevant information revealed by the record as part of egregious harm analysis).

We conclude the erroneous definition of intent in the jury charge did not egregiously harm appellant. We overrule appellant's fourth issue.

## Hearsay Evidence

In his second issue, appellant argues the trial court abused its discretion by allowing Officer Johnson to testify about the 911 call Chris made on the night of the murders. The State responds the issue is not preserved for review.

A party waives error regarding improperly admitted evidence if the trial court later admits the same evidence without objection. *See Johnson v. State*, No. 05-04-01640-CR, 2006 WL 1669650, at *7 (Tex. App.—Dallas June 19, 2006, no pet.) (mem. op., not designated for publication). The State admitted, without objection, the 911 recording of Chris's call in which he told the operator that appellant said he killed Brittany and Ross. Chris testified to the same information without objection. Even appellant testified he told Chris he killed Brittany and Ross.

Without addressing whether the trial court abused its discretion by admitting hearsay, we conclude appellant's argument is moot because similar testimony was admitted without objection. *Id.*; *see also Lane v. State*, 151 S.W.3d 188, 193 (Tex. 2004) ("error [if any] in the admission of evidence is cured where the same evidence comes in elsewhere without objection"). Accordingly, appellant's second issue is overruled.

## Article 38.22 Statements

In his third issue, appellant argues the trial court erred by allowing statements into evidence that failed to comply with code of criminal procedure article 38.22. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a) (mandating that no oral statements of an accused made as a result of custodial interrogation "shall be admissible against the accused in a criminal proceeding unless" certain requirements are met). The State concedes appellant was in custody at the time of the statements; however, it contends appellant's statements to police were res gestae and not the result of interrogation. *See Smith v. State*, 737 S.W.2d 933, 940 (Tex. App.—Dallas 1987, pet. ref'd) ("A res gestae statement is a statement made in response to a startling event, spontaneously or impulsively, without time for reflection or contrivance.").

During a pretrial hearing, appellant argued his statement to Officer Wendling that he "just lost it" was inadmissible and should be suppressed because it did not comply with article 38.22. The trial court overruled the objection. Appellant renewed his article 38.22 objection during Office Wendling's trial testimony, and the trial court again overruled it. Officer Wendling then testified that he handcuffed appellant after appellant approached him at Target. Officer Wendling explained that although appellant was handcuffed "at that time, he wasn't necessarily under arrest" because he did not know the whole story and what was going on other than the initial 911 call. Officer Wendling told appellant, "[Y]ou're being handcuffed because we

–17–

have a report that some people might have been hurt and you might be involved somehow." Appellant then said "something to the effect of, 'Yeah, I just lost it.'"

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *Randolph v. State*, 152 S.W.3d 764, 769 (Tex. App.—Dallas 2004, no pet.). This standard gives almost total deference to a trial court's determination of historical facts and applies a de novo review of the trial court's application of the law to those facts. *Falfan v. State*, No. 05-13-01124-CR, 2014 WL 2583768, at *2 (Tex. App.—Dallas June 10, 2014, no pet.) (mem. op., not designated for publication). The trial court is the sole trier of fact, the judge of witness credibility, and determines the weight given to witness testimony. *Randolph*, 152 S.W.3d at 769. We must sustain a trial court's decision to overrule a motion to suppress if the decision is supported by the record and is correct under any theory of law applicable to the case. *Falfan*, 2014 WL 2583768, at *2.

Article 38.22 mandates that no oral statements of an accused made as a result of custodial interrogation "shall be admissible against the accused in a criminal proceeding unless" the statement is recorded and "prior to the statement but during the recording the accused is given" certain required warnings. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a) & § 2(a)(1)–(5). These warnings are mandatory, and any statements made without them are presumed to have been involuntarily made and therefore inadmissible at trial. *See Martinez Pineda v. State,* No. 12-18-00019-CR, 2019 WL 3024769, at *2 (Tex. App.—Tyler July 10, 2019, pet. ref'd) (mem.

–18–

op., not designated for publication). These safeguards, however, do not exist to protect suspects from their own propensity to speak, absent some police conduct that knowingly tries to take advantage of the propensity. *Jones v. State*, 795 S.W.2d 171, 176 n.5 (Tex. Crim. App. 1990) (en banc).

Oral statements may be admissible if they constitute statements that are "the res gestae of the arrest or of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.22 § 5. A statement is res gestae if it is "made in response to a startling event, spontaneously or impulsively, without time for reflection or contrivance, and such a statement can be made in response to an inquiry." *Howard v. State*, No. 10-18-00325-CR, 2021 WL 1807376, at *2 (Tex. App.—Waco May 5, 2021, pet. ref'd) (mem. op., not designated for publication).

Statements by law enforcement that are normally attendant to arrest and custody, and "[o]ff-hand remarks that are not particularly evocative under the circumstances do not constitute interrogation." *Id.* Rather, an "interrogation" means (1) express questioning and (2) "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Alford v. State*, 358 S.W.3d 647, 653 (Tex. Crim. App. 2012). Interrogation must reflect a measure of compulsion beyond that inherent in custody itself. *Cravens v. State*, No. 05-21-00947-CR, 2022 WL 17248836, at *7 (Tex. App.—Dallas Nov. 28, 2022, no pet.) (mem. op., not designated for publication).

Here, Officer Wendling knew appellant had possibly killed two people when appellant approached him in the Target parking lot; therefore, he placed appellant in handcuffs and explained to him why he handcuffed him:

> [I]t's part of our policy to tell somebody why we stopped them when we stop them. We tell somebody why we're arresting them when we arrest them. And, granted, at that time, he wasn't necessarily under arrest[,] but he was handcuffed. I told him, hey, I don't know what's going on because I really didn't know what all was going on at that time other than the initial call. I said, I'm placing you in handcuffs. I'm not putting you in my car because I have a dog here, and I'm going to have you sit here. And you're being handcuffed because we have a report that some people might have been hurt and you might be involved somehow. I don't know -- he said something to the effect of, "Yeah, I just lost it."

Officer Wendling's explanation to appellant of why he handcuffed him is the type of statement that is "normally attendant to an arrest and custody" and did not constitute interrogation. *Howard*, 2021 WL 1807376, at *3. He did not ask appellant any questions; instead, appellant spontaneously volunteered the incriminating statement, "I just lost it," which was neither coerced nor in response to interrogation by law enforcement.

To the extent appellant also challenges his statements regarding weapons in the vehicle, we conclude it was also res gestae. Before arriving at Target, Officer Wendling knew appellant may have been involved in a shooting. When appellant approached him in the parking lot, Officer Wendling asked if he had a vehicle and appellant said yes and, without any questioning or coercion, he volunteered that

–20–

"there's some weapons in it." *See id.* As such, the trial court did not err in admitting appellant's res gestae statements.

Even if the trial court erred, which it did not, appellant was not harmed. *See* TEX. R. APP. P. 44.2(a) (error is harmless if court determines beyond a reasonable doubt error did not contribute to conviction); *see also Funes v. State*, 630 S.W.3d 175, 183 (Tex. App.—El Paso 2020, no pet.) (assessing harm under rule 44.2(a) when appellant raises both statutory and constitutional error). As a reviewing court, we must "calculate, as nearly as possible, the probable impact of the error on the jury in light of the record as a whole." *Id.* (quoting *Wall v. State*, 184 S.W.3d 730, 746 (Tex. Crim. App. 2006)). The evidence of appellant's guilt, as previously detailed, was overwhelming and his res gestae statements were unlikely to sway a jury from a state of non-persuasion to persuasion of his guilt. We overrule appellant's third issue.

**Modification of the Judgment**

Though not raised by appellant as an issue, he states in a footnote that the judgment recites the jury, not the trial court, assessed punishment. Where the record contains the necessary information to do so, the court of appeals has authority to modify the incorrect judgment. TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993) (en banc).

At the conclusion of the proceedings, the trial court sentenced appellant to life in prison. Because we have the necessary information to do so, we modify the

–21–

judgment to reflect the trial court, not the jury, assessed punishment. TEX. R. APP. P. 43.2(b); *Bigley*, 865 S.W.2d at 27; *Cortez v. State*, No. 05-22-00089-CR, 2023 WL 370180, at \*1 (Tex. App.—Dallas Jan. 24, 2023, no pet.) (mem. op., not designated for publication) (modifying judgment to reflect trial court, not jury, assessed punishment).

## Conclusion

As modified, we affirm the trial court's judgment.


221158f.u05
Do Not Publish
TEX. APP. P. 47.2(b)

/Erin A. Nowell//
ERIN A. NOWELL
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

BLAKE RYAN RICHARDS,
Appellant

No. 05-22-01158-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 416th Judicial
District Court, Collin County, Texas
Trial Court Cause No. 416-80133-
2022.
Opinion delivered by Justice Nowell.
Justices Miskel and Kennedy
participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

Under "Punishment Assessed by," we **DELETE** "JURY" and **REPLACE** with "TRIAL COURT."

As **MODIFIED**, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 23rd day of April, 2024.